concurring in the grant of rehearing en banc:
This is an urgent case of extraordinary importance involving the suppression of minority voters on the eve of a presidential election.
*792 “Arizona has criminalized one of the most popular and effective methods by which minority voters cast their ballots.” Thomas Dissent at 840 F.Bd 1057, 1086. The law at issue makes it a felony for most people to accept a ballot that a voter has filled out and deliver it to the appropriate polling place on the voter’s behalf. It punishes the routine actions of many get-out-the-vote organizations and political campaigns. Violators can be sentenced to a year in jail and a $150,000 fine. Despite the panel majority’s opinion to the contrary, the record in this case fully documents the disparate burden that this law imposes on minority voters. “There are many burdens and challenges faced in Arizona by Native Americans, Hispanics, African-Americans, the poor, and the infirm who do not have caregivers or family. With H.B. 2023, Arizona has added another: disenfranchisement.” Thomas Dissent at 840 F.3d at 1097. It is just as clear that the state’s justifications for the law do not withstand any level of scrutiny.
It is indeed no secret' that many states have recently enacted legislation making it more difficult for members of minority groups to vote in presidential elections. Arizona is one. It has done so under the guise of guarding against voter fraud, although not one single case of voter fraud in the history of Arizona elections was identified by the Arizona legislature when it enacted statutes changing its system to attempt to limit the opportunity to vote of members of minority groups—of Hispanics, African Americans, and Native Americans—as well as the poor and infirm. And not one case of voter fraud has been cited to the district court or this court by Arizona when seeking to defend its indefensible and race-based statute.
In the wake of the panel majority’s opinion upholding the invidious Arizona statute by a 2-1 vote, the judges on this court voted to take the case en banc. I am confident that a majority of the members of the court do not support the panel majority’s view that the pretextual risk of voter fraud outweighs the significant burdens on the right to vote imposed by this unconscionable law. I am confident, instead, that the majority of the members of the court agree with Chief Judge Thomas’s persuasive opinion that “the anti-ballot-collection law significantly burdens the voting rights of minorities, particularly Hispanic and Native American voters” and that “[t]he State’s justification of preventing voter fraud was not, and is not, supportable.” Thomas Dissent at 840 F.3d at 1097.
⅜ ⅜ ⅜
Different members of the court embrace differing legal philosophies and historical understandings regarding the significance of the Voting Rights Act and the Constitution with relation to election restrictions and their discriminatory effects. A decision on an issue of such profound legal and political importance that could affect not only the rights of Arizona citizens but the interests of all Americans in the outcome of a presidential election should not depend on a 2-1 vote of three members of a panel of our court. Rather, our en banc process affords a more representative sampling of this court’s group of judges in helping to decide , what fundamental approach to voting rights this Circuit will adopt. An en banc court of eleven is ordinarily far more likely than a panel of three to express the view of the court as a whole.
Unfortunately, however, our en banc process is not perfect and also does not necessarily represent the view of the full court. It is selected by lot, as a full court en banc is ordinarily deemed too unwieldy. Thus, although it is preferable to a three judge panel, in an extraordinary case such as this, it too may not accurately reflect the view of the court as a whole. It is *793 possible that we will be faced with such a case here. The en banc court here is composed of a majority of judges who did not support the en banc call. Although I would hesitate to predict the outcome of the en banc court’s deliberation, it may be that its judgment will not reflect the view of the full court. Nevertheless, although the en banc court is weighted by chance in favor of those who failed to support en banc rehearing, it still has a better chance of representing the view of the court as a whole than does any panel of three. If the en banc court does not reach the conclusion that I believe the full court would have reached, at the least it reflects a proper use of our en banc system. In my own view, regardless of the decision of the en banc court, I am confident that the court as a whole would have rejected the panel majority’s conclusion and enjoined the enforcement of the Arizona ■ statute, although we will probably never know if I am correct..Whether I am or not, I should emphasize that whatever .decision the en banc court reaches will be legitimate and will properly be binding on our court and in pur Circuit.
[[Image here]]
Judge O’Scannlain, whose view regarding convening an en banc court was rejected by the full court in the only vote in this case the full court is likely to take, asks, “Why the rush?” O’Scannlain Dissent at 794. Here is one answer: a presidential election is just one week away, and the franchise of a potentially decisive number of voters depends upon our decision. If we conclude that we ought to do nothing while we still can because acting now might affect the very election that the challenged statute was enacted to distort, we would not only permit Arizona to frustrate the purposes of the Voting Rights Act and the Constitution, but also encourage other state legislatures to pass laws carefully timed to be effectively unreviewable in court and carefully designed to influence the outcome of specific elections.
It is particularly ironic that Judge O’Scannlain cites Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), in support of his argument that the court should sit resolutely aside as discriminatory voter suppression goes unredressed. In Purcell, the Supreme Court stayed an injunction of a different Arizona law affecting the 2006 mid-term election in part because “Arizona [was] a covered jurisdiction under § 5 of the Voting Rights Act of 1965.” Id. at 2, 127 S.Ct. 5. The state was, as a result, “required to preclear any new voting ‘standard, practice, or procedure’ with either the United States Attorney General or the District Court for the District of Columbia to ensure its new voting policy did ‘not have the purpose [or] effect of denying or abridging the right to vote on account of race or color.’ ” Id. Arizona had obtained that pre-clearance for which Congress had provided. Id. at 3, 127 S.Ct. 5.
After the Supreme Court’s 2013 decision in Shelby County v. Holder, however, which effectively invalidated the preclearance provision of § 5, — U.S.-, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), the courts provide the only meaningful check on voter suppression and on discrimination in the exercise of the most fundamental civic right in our democracy. The extraordinary circumstances of this case thus make it all the more necessary for us to uphold what remains of the Voting Rights Act and enforce the constitutional, rights of all citizens—including the members of minority groups that the majority of the Arizona state legislature might prefer not to hear from in this election.
Notwithstanding Judge O’Scannlain’s arguments as to what the Supreme Court would do, we have a duty to enforce the *794 law and our constitution as we see it. Equally important, despite a similar injunction issued by the Fourth Circuit, the Supreme Court has not intervened to stay any action taken by a circuit court in advance of the 2016 presidential election, but has left such disputes for the circuit courts to resolve. Moreover, this Arizona criminal statute, which applies to third parties and carries a serious jail sentence, is far different from those which the Supreme Court has declined to enjoin in previous election cycles. To calm Judge O’Scannlain’s fears, however, I would note that the Supreme Court is quite capable of timely staying any injunction that our court may issue if it disagrees with us.
⅜⅜⅜
I concur in the well-advised order granting rehearing en banc. Even should the en banc court not reach the result I am convinced the majority of the full court would have reached, we will have followed the best process that is available to us in our attempt to do so. We will also have exposed, although in dissent, the inequity and essential vice of the Arizona statute. Should, however, the' en banc court adopt the view I believe to be held by the court as a whole, we will have accomplished far more. We will have vindicated the right of all voters to fair and just treatment under the United States Constitution and Section 2 of the Voting Rights Act.